STATE of Iowa, Appellee,

v.

Phillip Benito CUEVAS, Appellant.

No. 62598.

Supreme Court of Iowa.

Feb. 20, 1980.

Philip F. Miller, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Selwyn L. Dallyn, Asst. Atty. Gen., Dan L. Johnston, Polk County Atty., and James W. Ramey, Asst. Polk County Atty., for appellee.

Considered by REYNOLDSON, C. J., and HARRIS, ALLBEE, McGIVERIN and LARSON, JJ.

ALLBEE, Justice.

Defendant Phillip Benito Cuevas stands convicted by a jury of murder in the first degree, in violation of sections 690.1 and 690.2, The Code 1977; he was sentenced to imprisonment for life. The charge arose out of the brutal slaying of William Turk, which occurred in Des Moines on October 5, 1977. On appeal, defendant assigns a number of errors for reversal of his conviction, which we will consider in the order presented to us in his brief.

The victim's body was discovered on October 6, in the late afternoon. When found,

Turk's hands and feet were bound behind his back. He was gagged and lying face down in a pool of blood. He had sustained nine stab wounds in the chest and back and a crushing skull fracture. A sixteen centimeter knife blade, with the handle broken off, was embedded about half its length into the middle of his back. The medical examiner attributed the cause of death to massive cranial trauma. On December 1, 1977, by County Attorney's Information, defendant, his wife Mary Ellis Cuevas and Albert Leo Galvan were charged with the crime. Other facts will be related as necessary for the treatment of the issues raised by defendant.

I. *The refusal of a change of venue.* Defendant made three motions for a change of venue but only the last one, made at the outset of trial, is the subject of our review. The first such motion, filed February 2, 1978, and amended on March 6, was overruled; however, trial of the case was ordered continued. The second motion, requesting either a change of venue or a continuance, was filed on March 23. Judge J. P. Denato thereafter continued defendant's scheduled trial from April 3 until September, thereby making moot the motion for a change of venue. *State v. Weiland,* 202 N.W.2d 67, 70 (Iowa 1972). The first two motions for a change of venue were predicated upon both prejudice within the community, supported by affidavits, and media reports of defendant's trial and conviction of another murder, his ensuing attempt to gain a new trial after that conviction, the trials of his confederates and a gruesome mass murder which occurred in downtown Des Moines in February 1978. Judge Denato took specific cognizance of those events and their attending media attention when granting the second continuance to September.

The third and final motion for a change of venue was dictated by counsel on September 12, following defendant's pretrial presentation of testimony regarding station WHO television and radio coverage of the case. This motion also asked the court to take notice of past publicity surrounding defendant and his confederates. Defendant, in the alternative, again asked for a continuance.

■ Our examination of defendant's motion for a change of venue and trial court's denial is, in this case, to be guided by standards that prevailed prior to the effective date of the new Iowa Criminal Code, January 1, 1978. 1976 Session, 66th G.A., ch. 1245(4), § 529. This is because the offense with which defendant was charged was committed before that date; thus the prosecution of the case, even though it took place after that date, is governed by the prior law, § 801.5(1), The Code 1979, as we find no request by defendant that procedural provisions of the new code be applied, § 801.5(2)(b)(1), The Code 1979.[1]

■ Consequently, in asking for a change of venue in this case, the movant had the burden to either establish prejudice in fact, or to show the publication of material which is so potentially prejudicial that prejudice must be presumed. *Pollard v. District Court,* 200 N.W.2d 519, 520 (Iowa 1972). Defendant's third motion for a change of venue rested upon the latter showing. Thus the critical question here is whether under the record made by defendant a reasonable likelihood existed that a fair trial would not be had because of the media dissemination of potentially prejudicial publicity. *Id.*

■ We have reviewed the record de novo for the purpose of determining whether trial court abused its discretion in denying the requested change of venue, thereby, in result, holding that defendant failed to demonstrate a reasonable likelihood that he would not receive a fair trial in Polk County because of the publicity given his trial. *State v. Paulsen,* 265 N.W.2d 581, 588 (Iowa 1978); *State v. Pelelo,* 247 N.W.2d 221, 223 (Iowa 1976). Based upon our independent evaluation of the record, we conclude that trial court did not err in overruling the final change of venue motion. Suffice it to say that the publicity accorded the com-

1. A change of venue is now governed by Iowa R.Crim.P. 10(9).

mencement of defendant's trial was only factually informative in nature; it was neither intensive nor inflammatory in tone. *State v. Davis,* 196 N.W.2d 885, 888–89 (Iowa 1972). We are satisfied that the publicity at the time defendant's case went to trial did not deprive him of a fair trial. Nor does it appear that the more intensive media coverage of defendant's earlier tried murder case, or the cases involving his confederates, or prior publicity and comment concerning other homicides, on the basis of which he was granted continuances in March and April, pervaded his trial in September.

In addition, heeding the suggestion made in *State v. Davis,* the voir dire examination of the jury was reported. *Id.* at 889. The transcript of that examination reveals careful questioning of each prospective juror concerning his or her knowledge of the persons and event in issue and his or her objectivity. Those jurors ultimately selected indicated they knew little or nothing about either the case or the defendant, and they uniformly declared that they could afford defendant a fair and impartial trial. The impanelled jury was then sequestered throughout the trial and was not permitted access to further media accounts of the trial.

For these same reasons, there also was no abuse of discretion in trial court's refusal to grant another continuance.

II. *The admission of exhibits.* Error is claimed in the admission of several articles of evidence. For an understanding of our resolution of this claim, we must relate additional facts which may be drawn from the evidence.

On the night of October 5, 1977, Albert Leo Galvan was at the home of his former wife, Jenny. At a little past ten o'clock, defendant telephoned and talked to Galvan, who then left that residence. Galvan returned after eleven and about five minutes later defendant and his wife arrived. They went directly to the bathroom, and Galvan went there, too. Running water could be heard. Then defendant's wife borrowed a pair of slacks from Jenny. Defendant also asked for and was given a paper sack and some charcoal starter fluid. He returned to the bathroom and, shortly thereafter, carried the grocery-sized sack, with something in it, along with the starter fluid, to the back porch. These four people then had some supper and watched television for awhile before defendant and his wife left. They were observed by Jenny entering and driving away in an automobile that had a white top and a red body. After they left, Jenny found a blood stain in her bathroom sink.

Later that same night, at around two a. m. of October 6, defendant was stopped by a deputy sheriff. Defendant was driving a 1974 Mark IV Continental, described as white over red in color. He was accompanied by a female. The deputy's attention was attracted to the automobile because of its speed. Defendant had neither a driver's license nor any other kind of identification; he said his name was Richard Cuevas. The deputy required that defendant perform some sobriety tests, but concluded that he was only a borderline suspect of driving while under the influence of an alcoholic beverage. The woman with defendant appeared to be sober, she had a driver's license, so the deputy released defendant to go home on the condition that his female companion take over the driving.

In the late afternoon of October 6, in Kansas City, Missouri, a white over red 1974 Mark IV Lincoln Continental automobile was observed illegally parked in a towaway zone in front of the Federal Building, about half a block from the Greyhound Bus Depot. Kansas City police subsequently impounded the vehicle and inventoried personal property found in it. Among the numerous items inventoried were a sawed-off shotgun, an empty Hamm's beer can and a white t-shirt with a series of numbers on it. The automobile was subsequently identified as owned by the victim, William Turk.

At trial, exhibits were admitted, over objections, of fingerprints lifted from the shotgun barrel and the empty beer can which matched the known fingerprints of

Mary Ellis Cuevas, and the white t-shirt, which was shown to be defendant's. Evidence was also admitted that dried blood taken from the butt of the shotgun was of the same blood type as the victim's; in addition, there was testimony that the physical outline of the butt-end of the shotgun appeared to match a wound imprint on the victim's back, that imprint being visible in a photograph received in evidence.

The medical examiner testified that in his opinion Turk's death occurred between five p. m. of October 5 and three a. m. of October 6.

Defendant introduced evidence that the victim was under investigation by the FBI on suspicion of being in possession of stolen travelers' checks of very substantial value, and that he was a suspect in the passing of counterfeit cashier checks. It was also shown that Turk had a felony conviction record.

■ A. We now turn to defendant's challenges to the propriety of the admission into evidence of specific exhibits. Defendant first points to the overruling of a foundational objection made to testimony directed toward identifying the sawed-off shotgun. The shotgun had been broken down into two exhibits: the gun barrel and attached mechanisms, and the butt. When the actual offer of each was made, defense counsel stated there was "no objection." Consequently, the propriety of the admissions of these exhibits into evidence cannot now be questioned. *See State v. Pitlik,* 247 N.W.2d 741, 743 (Iowa 1976).

B. The next challenge is to the admission of exhibits of the fingerprints of Mary Ellis Cuevas lifted from the shotgun barrel and the empty beer can. Among the several grounds urged in defendant's objections to the offer of those exhibits, the grounds sufficient to question the propriety of the admission of the exhibits were their relevancy and materiality. Of course, the determination of relevancy and materiality rests largely within the trial court's discretion. *State v. Fuhrmann,* 257 N.W.2d 619, 625 (Iowa 1977).

■ The fingerprints taken from those articles which were found in the murder victim's automobile not only supported other evidence that defendant and his wife were in possession of the vehicle subsequent to the killing, but one exhibit also placed the fingerprints of defendant's wife on a weapon linked to the homicide. Along with other evidence of defendant and his wife having been together on the night of the murder, the fingerprint evidence connecting defendant's wife to the homicide was pertinent to resolving the issue in dispute: whether defendant participated in or aided and abetted the offense charged. Thus it was material. *Id.* at 625; *Vine Street Corp. v. City of Council Bluffs,* 220 N.W.2d 860, 862 (Iowa 1974). Furthermore, the fingerprint evidence, coupled with evidence of defendant's presence with his wife at several points in time on the night of the crime, afforded a basis for the inference that defendant participated in or aided and abetted the crime. Certainly the evidence rendered the desired inference more probable than it would have been without such evidence; thus it was relevant. *State v. Ball,* 262 N.W.2d 278, 279 (Iowa 1978); *State v. Fuhrmann,* 257 N.W.2d at 625; *see Schiltz v. Cullen-Schiltz & Associates, Inc.,* 228 N.W.2d 10, 16 (Iowa 1975). There was no abuse of discretion here.

C. Trial court's admission into evidence of the white t-shirt found in the victim's automobile is also claimed by defendant to constitute error. The series of numbers on the t-shirt were, in fact, a prison identification number previously assigned to defendant. This was never made known to the jury by any evidence, however. Before the t-shirt was identified and offered as evidence, defense counsel stipulated that it was defendant's, thereby seeking to avoid any further identification of it. When trial court indicated it would nevertheless permit the State's witnesses to describe the t-shirt and where it was found, and the prosecutor made known that he intended to pursue this line of identification, but without inquiry as to the significance of the identification number on the t-shirt, defense counsel withdrew the stipulation. The State then pro-

duced a witness who identified the white t-shirt as the one found in the impounded automobile and who also described the shirt as having numbers on it. The t-shirt was thereafter admitted into evidence. Subsequently, defense counsel stipulated that it was defendant's t-shirt, thus avoiding any necessity by the State of establishing that it was defendant's by testimony that it bore his prison identification number. At trial, defense counsel, in objecting to the State's offer of the t-shirt, recited numerous but general grounds. On appeal, defendant simply argues that the admission was "highly prejudicial."

We are satisfied that there was no error in admitting the white t-shirt into evidence. It was found in the victim's automobile; there was evidence that defendant was in possession of that vehicle following the murder; it was defendant's t-shirt. Even assuming arguendo that the identification number on the t-shirt suggested to the jury defendant's conviction of some other criminal offense, the exhibit was admissible as proof of a fact which tended to establish defendant's identity as one involved in the crime for which he was on trial. *State v. Terrill*, 241 N.W.2d 16, 20 (Iowa 1976); *State v. Redding*, 169 N.W.2d 788, 791 (Iowa 1969). Nor did trial court abuse its discretion in not restricting the State's identification evidence of the t-shirt to defendant's original stipulation. The State has the right, undiluted by stipulation, to present evidence relevant to the crime charged. *State v. Moore*, 276 N.W.2d 437, 441 (Iowa 1979).

III. *The limitation upon defendant's cross-examination.* Defendant contends that trial court erred in unduly limiting defendant's cross-examination of one of the State's witnesses. The witness, a police officer, on direct examination had testified as to his role in the investigation of the Turk murder. On cross-examination defense counsel attempted to question the witness about hair extraction and analysis, a subject matter not broached in the direct examination. The State's objection that the inquiry was beyond the scope of the

direct examination was sustained. During ensuing colloquy, trial court inquired whether the question was for the purpose of testing the credibility of the witness. Defense counsel replied that it was not.

Defendant insists that cross-examination of the State's witnesses should be liberally extended. This is true. Nonetheless, the scope of cross-examination is limited to (1) matters inquired into on direct examination or (2) matters which pertain to the witness's credibility, bias, ill will, hostility or interest in the case. *State v. Musack*, 254 Iowa 104, 109–10, 116 N.W.2d 523, 526 (1962).

Here we are concerned only with whether the cross-examination was aimed at a matter touched upon in the direct examination. We are mindful that the scope of permissible cross-examination lies within the sound discretion of the trial court. *State v. Ege*, 274 N.W.2d 350, 357 (Iowa 1979). On the record before us, we cannot say that trial court abused its discretion.

We note, parenthetically, that trial court also suggested to defense counsel that he could either recall or make the officer his own witness if he wished to do so. Defendant did, in fact, call the officer as a witness for the defense. We do not find, however, that defendant then pursued any inquiry regarding hair extraction and analysis.

IV. *The assertion that trial court interference deprived defendant of a fair trial.* Defendant asserts that trial court improperly interfered in the conduct of the trial by interrupting defendant's cross-examination of a witness to insist that a knife be marked as an exhibit, in objecting on its own motion to a question propounded by defense counsel and in questioning the medical examiner to establish the time of the victim's death. Trial court, according to defendant, repeatedly aided the prosecution and restricted the efforts of the defense.

Our study of the trial transcript reveals that this case was vigorously defended. Similarly, the prosecution was pursued with considerable zeal. The combined ardor of counsel for the defense and prosecution at times generated contentiousness. As a con-

sequence, trial court was frequently compelled to act to maintain decorous control of the proceedings. While in this case we find no abuse of discretion in any of trial court's actions, we believe some comment upon the role and conduct of a trial judge may be useful.

■ The presiding judge is not a mere functionary present only to preserve order and lend ceremonial dignity to the proceedings.[2] We have previously said that the judge's role is not restricted to the functions of an umpire or referee in a contest between opposing parties or counsel.[3] We have declared that a trial judge has the duty to control and conduct its court in an orderly, dignified and proper manner. *State v. Harris,* 222 N.W.2d 462, 465 (Iowa 1974); *Schroedl v. McTague,* 169 N.W.2d 860, 867 (Iowa 1969). In fulfilling its role, occasions will arise when a trial judge is constrained to intervene on its own volition to protect a witness from abusive treatment or unnecessary humiliation, to stay the pursuit of a patently irrelevant line of inquiry—particularly when it may obfuscate the issues and mislead the jury, to act to avert unnecessary repetition, to require that the proceedings move forward without undue delay and to take reasonable measures to insure that the evidence is intelligibly presented to the jury.

Yet the trial court should not intervene without cause to do so. There may be a greater risk of prejudice from over-intervention than from under-intervention. Counsel should be given reasonable latitude to employ their selected strategies and tactics in an unhurried manner.

■ But when compelled to intervene, the court should conduct itself with scrupulous detachment; it must act as a neutral force in the interplay of an adversary process. It is imperative that the court not become an advocate of any party's cause. *State v. Glanton,* 231 N.W.2d 31, 36 (Iowa

1975) (dictum). Recently, *State v. Larmond,* 244 N.W.2d 233, 235 (Iowa 1976), reminded the trial bench that "a presiding judge should not only be fair and impartial, he must conduct himself in the trial to constantly manifest those qualities." Conduct by which the jury could infer bias against any party is to be avoided. *Id.* at 236.

■ Giving attention now to defendant's specific complaints, we find that at trial defense counsel lodged no objection to trial court's intervention to require that a knife being referred to in the cross-examination be marked as an exhibit. Not only were trial court's actions reasonable to facilitate the orderly presentation of evidence and the creation of a comprehensible record, but for lack of any objection no error was preserved. *See State v. Harmon,* 238 N.W.2d 139, 143 (Iowa 1976).

■ The next incident called to our attention occurred during defendant's cross-examination of a forensic scientist who had disclaimed knowledge of a fact about which he was questioned. Defendant persisted, however, in the inquiry concerning the fact, and after a series of repetitions of essentially the same question, which the witness had already claimed to be unable to answer, trial court intervened, stating, "You are getting argumentative now, Mr. Miller." The question was, nevertheless, responded to by the witness and no objection to trial court's action was made. A later motion for mistrial was based upon this occurrence. The court, in overruling the motion, opined that it felt it had "some duty to protect a witness." Again, while error was not preserved, *see State v. Reese,* 259 N.W.2d 771, 775 (Iowa 1977), we have considered trial court's conduct and believe that it acted within its discretion. The court's intervention was more a form of admonition than an objection. In addition, the trial tran-

---

2. For trial court guidance generally, we commend attention to ABA Project on Standards For Criminal Justice, The Function of the Trial Judge (Approved Draft 1972).

3. "[I]t must be borne in mind that the judge does not play the part of an owl, merely gazing at the participants and looking wise." *People v. Gaston,* 85 Ill.App.2d 403, 408, 229 N.E.2d 404, 406 (1967).

script reflects the intensity of the questioning, which bordered on the badgering of the witness. Trial court was justified in acting, and did so without bias or prejudice to defendant's rights. *See State v. Albers,* 174 N.W.2d 649, 658 (Iowa 1970).

Lastly, defendant claims that trial court improperly entered into the questioning of the medical examiner. The witness had engaged in an entangled and lengthy explanation of how he had arrived at his opinion of the time of the victim's death. Ultimately, this witness testified that the death occurred "in the range of eighteen to twenty-eight hours before nine o'clock p. m. on the 6th of October." Shortly thereafter the State concluded its examination. The cross-examination that followed was tending to obfuscate the time of death, as the witness's responses were a confusion of hours, times and dates. This then transpired:

THE COURT: Wouldn't it be to simplify the record if the doctor would tell us what eighteen to twenty-eight hours before 9:00 a. m. [*sic*][4] on the 6th of October is, between what those times are? I believe that would simplify things, make it much less confusing, Doctor. If you will figure out what between those two times was.

THE WITNESS: Nine p. m. we are starting at, and going back twelve hours would make it 9:00 a. m. on the 6th. Going back eighteen hours, that will be six more hours, six hours earlier than 9:00 a. m. would be 3:00 a. m. Now we want to go back ten hours before that. Ten hours before 3:00 a. m.—

MR. RAMEY: Perhaps the day, too, if you could, Doctor.

THE WITNESS: I am just trying to think of that, too. All right. And ten hours before that, 5:00 p. m. Twenty-four hours would be 5:00 p. m. on the 6th. And nine o'clock would be four more hours, yeah, twenty-eight hours.

4. Trial court's indication of "a. m." rather than "p. m." was obviously inadvertent and either unnoticed or disregarded both at trial and in the appellate briefs. In any event, the witness

THE COURT: Very well. Your testimony is then that, by your examination, that you put the date of death between 5:00 p. m. on October 5th and 3:00 a. m. on October 6th, is that correct?

THE WITNESS: Exactly, yes.

THE COURT: I think that will straighten the record out.

MR. RAMEY: I have no further questions, Your Honor.

THE COURT: Mr. Miller?

MR. MILLER: I certainly have no more.

THE COURT: Thank you.

MR. RAMEY: With that, Your Honor, the State rests his case in chief.

Following the foregoing, a recess was taken during which defense counsel moved, "[F]or the record, we would request a mistrial for the Court's examining Dr. Wooters and establishing the time of death."

It is doubtful that the error claimed here was preserved. No objection was made to the court's questions, *State v. Harmon,* 238 N.W.2d at 143; no motion to strike any answer to those questions was made, *State v. Reese,* 259 N.W.2d at 775; only after the witness was excused, the State rested and a recess taken was the motion announced. We thus observe that the timeliness of the motion is questionable. *See State v. Johnson,* 260 Iowa 1207, 1218, 152 N.W.2d 426, 732 (1967). In addition, we do not find from the trial transcript that the court in any way deterred the experienced defense counsel from making a proper record. *Cf. State v. Larmond,* 244 N.W.2d at 237 (oppressiveness of trial judge deterred counsel with limited courtroom experience from making an adequate record).

 We are also satisfied that trial court in denying the motion on its substantive merits did not abuse its sound discretion. Hence we will not interfere. *State v. Conner,* 241 N.W.2d 447, 455 (Iowa 1976). Although we have recognized the power of the trial judge to question witnesses, we

proceeded to compute the time range of death back from the point in time he established in his earlier testimony, *i. e.,* nine p. m. of October 6.

have cautioned against assuming the role of an advocate. *State v. Thornburgh,* 220 N.W.2d 579, 585 (Iowa 1974). *See generally McCormick's Handbook of the Law of Evidence* § 8 (2d ed. E. Cleary 1972); 98 C.J.S. *Witnesses* § 348 (1957). We do not encourage judges to enter the fray with their own interrogation of witnesses. And when cause to do so exists, restraint must be used. By engaging in the examination of witnesses the court becomes vulnerable to a multiplicity of criticisms; bias, prejudice or advocacy are some of those. Even facial expressions, gestures and voice modulation can be construed to evince an attitude or feeling toward a witness or party. *See State v. Larmond,* 244 N.W.2d at 236. It must always be borne in mind that jurors are particularly sensitive to the presiding judge's views, *State v. Kimball,* 176 N.W.2d 864, 867 (Iowa 1970), and may be unduly influenced by what they perceive those views to be.

Here trial court acted only to clarify the evidence regarding the perimeters of time within which the death occurred. The underlying evidence of those perimeters had previously been presented. In other words, trial court did not undertake the introduction of evidence; it asked about nothing not already before the jury. We note, also, that trial court's questions were impartially framed, with a view to "straighten the record out."

As we earlier stated, a trial court may take reasonable measures to insure that the evidence is intelligibly presented to the jury. We hold that this includes the power to clarify evidence through the questioning of witnesses when in the exercise of sound discretion it is reasonably deemed necessary. *See, e. g., People v. Gaston,* 85 Ill.App.2d 403, 407–08, 229 N.E.2d 404, 406 (1967); *People v. Konvinski,* 30 Mich.App. 271, 273, 186 N.W.2d 86, 87 (1971) (per curiam); *State v. Tate,* 468 S.W.2d 646, 648 (Mo.1971); *Lewis v. State,* 57 Wis.2d 469, 473–74, 204 N.W.2d 527, 530 (1973); 98 C.J.S. *Witnesses* § 348, at 64 (1957).

Trial court in this case acted within its power and without abuse of its discretion.

We are unable to find that defendant was deprived of a fair trial by the court's actions taken in the conduct of the trial.

V. *The denial of motion for new trial based upon juror bias and misconduct.* A brief summary of the background of this asserted error is needed for its understanding. Defendant's argument focuses on the prior knowledge and behavior of juror Oakes.

During the voir dire examination of Ms. Oakes by the prosecuting attorney, she stated that she knew several Galvans, but did not personally know the alleged confederate, Albert Leo Galvan. She also indicated that any negative feelings she had about the Galvans would not affect her opinion of defendant. While she admitted having read about the instant case in the newspaper, she indicated that there was no reason based upon what she had previously read or heard why she could not give a fair jury verdict.

Defense counsel was then given the opportunity to examine Oakes, which he declined to do. Rather, he exercised a peremptory challenge on her. The following day, however, when jury selection resumed, defense counsel moved that his challenge be lifted and that she be permitted to remain on the panel. He made this motion without having questioned her. The motion was granted.

After the jury had returned its verdict on September 16, 1978, defense counsel received some information from a trial spectator that led him to suspect Oakes may have introduced personal knowledge of defendant into the jury's deliberations. At defense counsel's request, an informal hearing was held on October 2. Oakes and two other jurors were examined for the purpose of defense counsel's investigating his suspicions.

The two other jurors both testified at the hearing that during the trial they had not discussed with Oakes any personal knowledge she allegedly had of defendant. One witness, however, testified that the trial spectator previously mentioned approached

her after the verdict was rendered and told her that Oakes knew defendant. That same witness also stated that after the verdict was returned Oakes related to her some information she knew about defendant that was not revealed at trial. But Oakes testified that such information was disclosed not by her but by another woman who was a party to that same conversation. Oakes also denied having met defendant before trial. Although she did admit having heard his name mentioned on one earlier occasion, she testified that she had forgotten it until she heard it again at trial.

The two other jurors additionally testified that Oakes had made a statement during deliberations to the effect that the Galvans were not nice people and that if she were found with a knife in her back, they should call Mr. Ramey, the prosecuting attorney. One of these jurors further commented that the statement was made laughingly and was probably heard only at one end of the jury table. Both of these witnesses denied that their deliberations were affected by the statement.

On October 6, defendant filed a combined motion in arrest of judgment and motion for a new trial. As one of the grounds, he alleged that the juror Oakes was biased against defendant and that she had engaged in prejudicial misconduct. Accompanying the motion were two affidavits. One was a statement by the previously mentioned trial spectator that after the verdict she had a conversation with Oakes which revealed Oakes's knowledge of information about defendant that had not been disclosed at trial. The other was a statement by an individual who said he discussed the "charges and deal against" defendant with Oakes prior to trial. Trial court overruled defendant's combined motion.

■ A. Defendant's objection to the juror Oakes on the basis of bias is waived for his failure to assert it earlier: "It is well settled that known objections, or those which may be ascertained, are waived if no challenge is made before the jury is sworn." State v. Grove, 171 N.W.2d 519, 520 (Iowa 1969); accord, Turner v. Jones, 215 N.W.2d 289, 290–91 (Iowa 1974). As previously indicated, defendant was advised during voir dire that Oakes knew of the Galvan family. Consequently, any objection for bias based upon her knowledge of Galvan was properly deemed waived. The bias objection may have also been based upon Oakes's alleged prior knowledge of defendant. That was unquestionably an appropriate subject of inquiry during voir dire, see Iowa R.Civ.P. 187(f)(9), and thus could have been ascertained in time for an expedient motion. Thus, that basis for the objection may also be considered waived.

Nonetheless, we have frequently looked at the subsequent evidence of juror bias or incompetence to determine if an appellant was prejudiced by denial of his tardy motion in cases, arguably such as this, where such appellant was previously unaware of the grounds for objection. See, e. g., Turner v. Jones, 215 N.W.2d at 290; Tollackson v. City of Eagle Grove, 203 Iowa 696, 700, 213 N.W. 222, 224–25 (1927); State v. Burch, 202 Iowa 348, 349, 209 N.W. 474, 474 (1926); State ex rel. Veile v. Funck, 17 Iowa 365, 372–73 (1864). See generally 47 Am.Jur.2d Jury § 219 (1969).

■ Our review of the record reveals no evidence that Oakes was biased against defendant. The evidence that she even knew him is slight and controverted by her testimony. Additionally, we note that there is a plausible, innocuous explanation for Oakes's knowledge of information about defendant which was conveyed to the affiant who was a spectator at the trial. The information Oakes related was the same as that which she testified to having learned after the trial from someone else. She also testified that the conversation with this other person occurred before her conversation with the affiant. The significance of the statement of the other affiant is also diminished upon close examination. It indicates that the subject of the discussion between the affiant and Oakes was the "charges and deal against" defendant, not the defendant himself.

*B.* In a separate argument, defendant also asserts as error trial court's ruling limiting as admissible evidence at the informal hearing only that which was relevant to juror misconduct which occurred before the verdict was rendered. As juror misconduct is only grounds for a new trial if it was calculated to, and it is reasonably probable that it did, influence the verdict, *Harris v. Deere & Co.,* 263 N.W.2d 727, 730 (Iowa 1978), obviously only evidence relating to conduct which occurred prior to the jury's reaching a verdict could have been relevant to defendant's argument of juror misconduct. Defendant's argument of juror bias, on the other hand, could have been logically supported by statements of the allegedly biased juror made either before or after the rendition of the verdict. Nonetheless, trial court's ruling was consistent with a determination that the objection of juror bias had been waived, a determination with which we agree. As the waiver rule does not apply where a juror has concealed bias, *Faville v. Shehan,* 68 Iowa 241, 243–44, 26 N.W. 131, 132 (1885), more extensive interrogation should be permitted if there is evidence that a juror has concealed bias. Defense counsel did not indicate that he was aware of evidence of that kind here. We therefore find no abuse of discretion in trial court's limitation of the evidence.

Moreover, we note that defense counsel largely ignored trial court's ruling in this regard. Substantially all the evidence he sought concerning disclosures of juror bias which took place after rendition of the verdict was given and included in the record of the hearing. Consequently, even if the ruling were erroneous, it was not prejudicial and thus could not constitute grounds for reversal.

*C.* Defendant also claims trial court erred in denying his motion insofar as it was based upon juror misconduct during deliberations. Trial courts have broad discretion in deciding whether the evidence of alleged jury misconduct warrants a new trial. *Harris v. Deere & Co.,* 263 N.W.2d at 729. Appropriate criteria for determining whether the acts or statements challenged constitute misconduct and whether such misconduct justifies a new trial have been fully and recently treated in *Harris, id.* at 730.

Applying those criteria here, we conclude that the motion was properly overruled. The only evidence of juror misconduct during deliberations was Oakes's lighthearted statement that the Galvans were not nice people and that if she were found with a knife in her back, the others should notify Mr. Ramey. During the informal hearing on October 2, Oakes testified that her statement was prompted only by some fleeting thought of reprisal and not a desire to help convict the defendant. She also corroborated another juror's testimony that the statement was made jokingly. Assuming that the statement constituted misconduct, it was certainly not calculated to influence deliberations. Nor do we find any basis for concluding that there was a reasonable probability that it did influence the verdict. In fact, the jurors who were questioned about it expressly denied that it had any effect on their deliberations.

*VI. The motion for mistrial based upon the reference to a mugshot.* During the State's rebuttal argument to the jury, the prosecutor referred outside the record to the fact that a witness, Officer Daniels, saw a "mugshot" of defendant. Out of the presence of the jury, defendant moved for a mistrial, stating that the mugshot reference could only convey to the jury that defendant had a criminal felony record and consequently it was inherently prejudicial. Prior to the motion, the prosecutor acknowledged having made the reference and apologized for it. Trial court overruled the motion, indicating that while it was improper to use the term, the court did not believe that it was so prejudicial as to require a mistrial. The court offered to admonish the prosecutor before the jury. Defendant declined to have the court either further admonish opposing counsel or instruct the jury to disregard the mention of the mugshot, lest there be too much made of the incident.

While defendant argued that prejudice ensued from the mugshot remark on the

premise that it connoted a felony record, what the jurors actually concluded from the reference is a matter of speculation. There was testimony adduced during trial that defendant was arrested and booked in Des Moines on another charge a few days after Turk's death. It is just as logical to assume that the jurors, if they noted and understood the term, inferred that the mugshot was taken at the time of that arrest, or inferred that it was taken in connection with the arrest for this prosecution, as it is to assume that they related it to some other, unknown arrest or crime. Whether any prejudice to defendant resulted from the remark is purely conjectural. We are not persuaded that this isolated episode resulted in prejudice which prevented a fair trial. *See State v. Webb,* 244 N.W.2d 332, 333 (Iowa 1976) (and cases cited therein). Trial court did not abuse its broad discretion when overruling this mistrial motion. *See State v. Wright,* 274 N.W.2d 307, 315 (Iowa 1979).

VII. *The denial of defendant's request for a directed verdict of acquittal.* Finally, defendant claims trial court erred in overruling his motions for directed verdict because there was insufficient evidence to sustain his verdict. He does not specify in what respect the evidence was insufficient.

In reviewing these rulings, we apply the principles announced at the same time as the filing of this opinion in *State v. Robinson,* 288 N.W.2d 337, 338–40 (Iowa 1980). Accordingly, we have considered all the evidence in the light most favorable to the prosecution. As a result, we have found that there was substantial evidence to support the verdict; a rational juror could find beyond a reasonable doubt that defendant is guilty of first degree murder.

We have considered every assignment of error briefed, whether specifically discussed or not, and none warrants a reversal; the conviction is affirmed.

AFFIRMED.