# IN THE COURT OF APPEALS OF IOWA

No. 21-1325
Filed October 19, 2022

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**DAVID SEAN HUNTER,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Story County, James C. Ellefson,

Judge.

David Sean Hunter appeals his conviction of first-degree murder.

**AFFIRMED.**

Tiffany Kragnes, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney

General, for appellee.

Heard by Tabor, P.J., and Schumacher and Chicchelly, JJ.

**CHICCHELLY, Judge.**

David Sean Hunter appeals his conviction of first-degree murder after killing his roommate. He challenges the sufficiency of the evidence supporting his conviction, contending the State failed to prove beyond a reasonable doubt that he did not act in self-defense. He also contends the trial court abused its discretion by denying his motion for mistrial and admitting some of the evidence at trial. Because substantial evidence supports the jury's verdict and the district court acted within its discretion in ruling on mistrial and evidence, we affirm Hunter's conviction.

**I. Background Facts and Proceedings.**

In November 2019, Hunter moved into a three-bedroom apartment after responding to an online ad for a roommate. The apartment was rented by Christopher Swalwell. Just five days later, Swalwell died from injuries inflicted by Hunter.

The conflict between Hunter and Swalwell began over a videogame charge. Hunter asked to use Swalwell's Xbox. Swalwell agreed and told Hunter there was a $1 monthly fee for setting up an Xbox account. But after setting up an account and entering his debit card information to pay the fee, Hunter received an email stating that he would be charged $15.99 per month instead. Hunter knocked on Swalwell's bedroom door to confront him about the discrepancy, but Swalwell shouted that he was sleeping. Hunter told the police "that was not the answer he wanted to hear."

Hunter gave law enforcement officers the following account of what next occurred: Swalwell attacked Hunter and knocked him to the ground before sitting

on his chest. While atop Hunter, Swalwell pressed the base of an oscillating fan against Hunter's throat, choking him. Hunter claimed he escaped when he "flipped" Swalwell off him. As he ran away, Swalwell threw something that struck Hunter in the back of the head.

While Hunter retreated, Swalwell gave chase. But Hunter had a plan; he ran to his bedroom and retrieved a kukri, a type of machete that Hunter described as having "a thick curved blade kinda shaped like a banana but thicker." Hunter told law enforcement that he had been sleeping with the kukri at night. According to Hunter, a kukri "is actually used for splitting coconuts," which was "what [he] tried to do to [Swalwell's] fucking head."

Once he retrieved the kukri, Hunter ran back to Swalwell and met him halfway down the hall. Seeing that Hunter had a weapon, Swalwell ran from him while pleading "please, please, please." But Hunter showed no mercy, shoving Swalwell down, swinging the machete, and hitting the right side of Swalwell's skull. Swalwell kept backing away as Hunter followed, still swinging the blade. When Swalwell reached the bathroom and could go no further, Hunter struck Swalwell "until he was done." While he did, Hunter yelled, "You're gonna die here tonight for putting your fucking hands on my throat."

Swalwell died from the injuries he sustained during the attack. The Polk County Medical Examiner performed an autopsy and offered a "conservative estimate" that Hunter struck Swalwell thirty times with the kukri. The blows left over forty wounds to Swalwell's torso, arms, neck, head, and face. One blow cut down to the bone of Swalwell's left arm, fracturing one of the bones of his forearm. Another cut through the back of Swalwell's neck to the spine, fracturing the second

vertebrae.[1]  The medical examiner also identified "approximately five definitive skull fractures" and described extensive injury to the brain.  He determined that Swalwell died from "multiple sharp force injuries" and estimated that, at best, Swalwell "would have been able to survive [only] a matter of hours."

As Hunter attacked Swalwell, another roommate, Todd Cleverly, was watching television in his bedroom.  Like Hunter, Cleverly had recently moved into the apartment after responding to Swalwell's online ad.  Cleverly did not socialize or interact much with either Swalwell or Hunter, explaining that he "basically kept to [him]self in [his] room."  On the day Swalwell died, Cleverly heard shouting followed by what sounded "[l]ike two guys getting in a scuffle, roughhousing, and [he] heard furniture moving around and it sounded like somebody might have hit the floor."  After a lull of "maybe thirty seconds to a minute," Cleverly heard "more incoherent" shouting "and then like a couple real sharp cracking noises" that sounded like "something hitting the doorjamb or a piece of furniture" or "something hitting against wood."

Shortly after the sounds from the altercation ended, Hunter entered Cleverly's bedroom looking "very angry" with a bloody machete raised in one hand.  Hunter asked Cleverly, "Am I going to have to kill you too?"  When Cleverly asked what was going on, Hunter explained that he had killed Swalwell.  Hunter then took Cleverly to the bathroom and showed him Swalwell lying face down on the floor between the toilet and bathtub.

---

[1] Although Swalwell's spinal cord was not damaged, the medical examiner explained that the injury "would have been extraordinarily painful."

The two men returned to Cleverly's bedroom where Hunter called Zola Taylor, a longtime friend, and told her he had just killed Swalwell. Cleverly confirmed to Taylor the attack occurred before finding an excuse to leave the apartment. Cleverly told Hunter he was going to the convenience store down the street to get something. As he left the building, Cleverly told a couple entering that "[s]omething really, really bad just happened in Apartment 202" and asked them to call the police and an ambulance.

Fifteen minutes later, Cleverly returned to the building but saw there were no emergency vehicles outside. Rather than returning to his apartment, Cleverly knocked on first-floor apartments to find help. When no one answered, Cleverly went to the third floor and resumed knocking on doors until the occupants of one apartment answered. Cleverly appeared "very visibly upset," shaking and sweating, and his voice was trembling. After Cleverly explained that one of his roommates attacked the other, the residents gave him a phone to call 911.

Paramedics and law enforcement were dispatched to the apartment where they found Swalwell alive but barely conscious. Swalwell was still trying to protect himself and could not verbalize responses beyond groaning or moaning. One of the responding paramedics, who had more than thirty years of experience, described confusion on seeing Swalwell's condition. Although dispatch had reported the emergency as a stabbing, Swalwell had what looked like sudden deceleration injuries—those that occur when someone is hit by a train, ejected from a vehicle during a high-speed crash, or falls from a great height or a moving vehicle. Swalwell was transported to a Des Moines hospital where he died from his injuries.

**II. Sufficiency of the Evidence.**

The trial court instructed the jury that to find Hunter guilty of first-degree murder, the State had to prove the following beyond a reasonable doubt:

> 1. On or about November 7, 2019, [Hunter] struck [Swalwell] with a kukri.
> 2. [Swalwell] died as a result of the actions of [Hunter].
> 3. [Hunter] acted with malice aforethought.
> 4. [Hunter] acted willfully, deliberately, premeditatedly and with a specific intent to kill [Swalwell].
> 5. [Hunter] acted without justification.

Hunter contests the sufficiency of the evidence supporting his conviction. He does not challenge the first four elements but contends the State failed to present substantial evidence showing he acted without justification, claiming he acted in self-defense.

In reviewing the sufficiency of the evidence showing self-defense, we view the evidence in the light most favorable to the State. *See State v. Fordyce*, 940 N.W.2d 419, 425 (Iowa 2020). "This includes all legitimate inferences and presumptions fairly drawn from the evidence in the record." *Id.* We consider all the evidence, not just the evidence that supports the verdict. *See id.* We uphold the verdict if supported by substantial evidence, which means evidence that would convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt. *See id.*

"When self-defense is raised, the burden rests with the State to prove beyond a reasonable doubt that the justification did not exist." *Id.* at 426. The State meets its burden if it proves any one of these elements:

> 1. The Defendant started or continued the incident which resulted in death; or

> 2. An alternative course of action was available to the Defendant;[2] or
>
> 3. The Defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save himself; or
>
> 4. The Defendant did not have reasonable grounds for the belief; or
>
> 5. The force used by the Defendant was unreasonable.

*Id.* (citation omitted).

Hunter claims he believed he was in imminent danger of death or injury and needed to use force to save himself. His argument rests on the premise that Swalwell began the physical confrontation, knocking him to the ground before sitting on his chest and pressing the base of a fan against his throat. But a reasonable fact finder could reject his claim. First, Hunter claimed that he escaped when he "flipped" Swalwell off him. But at six-feet-two-inches tall and weighing over 300 pounds, Swalwell was significantly larger than Hunter, who was five-feet-eight-inches tall and weighed 180 pounds. Swalwell, who was in his thirties, was also considerably younger than Hunter, who was fifty-five years old. Additionally, photographs of Hunter taken at the police station following his arrest do not depict any significant marks or discoloration to Hunter's chest or neck. Given the

---

[2] Before Swalwell's death, the legislature removed language on an alternative course of action from the justification statute and added a stand-your-ground provision. *See* 2017 Iowa Acts ch. 69, § 37. The law now states that "[a] person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as specified in this chapter." Iowa Code § 704.1(3) (2019). *Fordyce* does not address whether the stand-your-ground provision eliminates the "alternative course of action" option for disproving justification because the legislative amendment took effect after the crime occurred. 940 N.W.2d at 427. In *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 870 (Iowa 2019), the supreme court found the amendment "changed—but did not eliminate—the implied duty to follow an alternative course of action." Although a person not engaged in illegal activity has no duty to retreat, the duty is implied for those engaged in illegal activity. *See Lorenzo Baltazar*, 935 N.W.2d at 870.

discrepancies in size and age and the apparent lack of injury to Hunter's neck or chest, the jury could discredit Hunter's account of Swalwell sitting on him and attempting to choke him.

But even if the jury believed Hunter's claim that Swalwell attacked him first, substantial evidence shows that Hunter continued the altercation.[3] By Hunter's own account,[4] he fled from Swalwell and went to his room where he retrieved the kukri. Hunter then ran back toward Swalwell and met him halfway down the hallway. At that point, Swalwell began to back away as he begged "please, please, please." Hunter continued to advance and struck him thirty times with the weapon while Swalwell tried to get away from him until he was backed into the bathroom with nowhere to go.

---

[3] As stated in footnote 2, the legislature amended section 704.1 to eliminate the "alternative course of action" language and add a stand-your-ground provision to Iowa law. Although the amendment did not apply in *Fordyce*, the supreme court also noted that it was unnecessary to resolve the continued applicability of the "alternative course of action" alternative because substantial evidence showed the defendant also continued the incident that resulted in death. 940 N.W.2d at 427. This court found that reasoning bolstered its conclusion that an instruction containing the stand-your-ground language did not conflict with an instruction stating the justification defense is unavailable if a defendant continues an incident resulting in death. *See State v. Heckethorn*, No. 20-0243, 2021 WL 3392802, at *5–6 (Iowa Ct. App. Aug. 4, 2021) (observing further that the legislature has not amended section 704.6, which sets out the circumstances that render a justification defense unavailable, and noting that "courts have continued to use justification instructions containing the 'or continued' language after the stand-your-ground amendments").

[4] We note that Hunter provided a different account of what occurred when he called his friend, Zola Taylor, right after the attack. Taylor testified that Hunter told her the following: Hunter knocked on Swalwell's door to confront him about the charge, and Swalwell yelled back that he was sleeping. Hunter then went to his room, retrieved his kukri, and "put it down the back of his pants" before returning to Swalwell's bedroom. Swalwell attacked Hunter, who "was on the ground. [Swalwell] was on top of him with a fan to his throat, and he looked down at [Hunter] and said, 'Are we done?'" Hunter replied, "Yes, until I get up from here." Swalwell got off Hunter, and Hunter got up and hit Swalwell with the kukri.

Even assuming the jury found Swalwell was the aggressor and Hunter did not continue the altercation, substantial evidence supports a finding that Hunter used unreasonable force to defend himself. As part of the instruction on Hunter's justification defense, the trial court defined reasonable force:

> Reasonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent injury. If in the defendant's mind the danger was actual, real, imminent, or unavoidable, even if the defendant was wrong in estimating it or the force necessary to repel it, the force was justified if the defendant had a reasonable basis for his belief and responded reasonably to that belief. It is not necessary that there was actual danger, but the defendant must have acted in an honest and sincere belief that the danger actually existed. Apparent danger with the defendant's knowledge that no real danger existed is no excuse for using force.
> Reasonable force can include deadly force if it is reasonable to believe that such force is necessary to resist a like force or threat, or avoid injury or risk to one's life or safety. The State must prove beyond a reasonable doubt that the defendant's use of force was not justified.

A reasonable person could conclude that using a kukri against an unarmed person was unreasonable force to defend oneself. The number of times that Hunter struck Swalwell with the kukri—about thirty times as estimated by the medical examiner—adds to the unreasonableness of Hunter's actions. Hunter's position during the attack relative to Swalwell further suggests unreasonable force, as an expert in bloodstain pattern analysis who reviewed the crime scene evidence testified that the attack occurred in the bathroom and "Swalwell was either on or very close to the ground" as Hunter struck him. The nature of Swalwell's injuries—including cuts to the back of his neck and forearm that sliced down to the bone and at least five fractures of his skull—bolsters this conclusion. Finally, along with the things Hunter admitted saying to Swalwell during the attack, he made statements to

others before[5] and after[6] that could lead a reasonable person to find that Hunter went beyond the need to defend himself and attacked Swalwell with malice or as retaliation.

### III. Discretionary Rulings.

Hunter complains the district court abused its discretion in denying his motion for mistrial and in admitting certain evidence at trial. *See State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022) (stating the appellate court reviews the trial court's evidentiary rulings for an abuse of discretion); *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017) ("We review denials of a mistrial . . . for an abuse of discretion."). The district court abuses its discretion when it acts for reasons that are not supported by substantial evidence or when it erroneously applies the law. *See State v. Gomez Garcia*, 904 N.W.2d 172, 177 (Iowa 2017).

### A. Mistrial.

Hunter claims the district court erred by denying his request for a mistrial following two incidents he argues prejudiced the jury. The first incident occurred before the start of trial. One juror was seated in the courtroom when Hunter entered the courtroom with a deputy. Although Hunter was "dressed in street

---

[5] The day before the attack, Hunter said disparaging things about Swalwell to residents of the apartment above Swalwell's and remarked that he wanted to kill Swalwell.

[6] During the phone call after the attack, Taylor testified that Hunter returned to the bathroom while they talked and she listened to Hunter scream at Swalwell, "Yes, you son of a bitch, that's your brains you see on the floor. I split your skull." Taylor also testified she heard thudding that sounded like Hunter was kicking Swalwell while Hunter screamed, "You son of a bitch, I took the back of your skull off. They will find you laying here on the floor." Before their conversation ended, Hunter told Taylor that "they would find [Swalwell] in the bathtub" and that he "was going to collect [Swalwell's] head." Hunter used similar language when talking about Swalwell to law enforcement.

attire" and had no visible restraints, his attorney argued the juror "could get the impression that [Hunter]'s in custody as a result of that." Though he characterized the incident as "unfortunate," he also conceded that he did not believe Hunter was unfairly prejudiced:

> We did have a conversation about how the vast majority of jurors in this type of case have an understanding that the defendant is probably in custody anyway, and so not a huge deal; but I just wanted to be able to put on the record that, one, we're bringing it to the Court's attention; two, we have had an opportunity to discuss this with Mr. Hunter and he is okay with not requesting that juror to be removed at this time . . . .

He also conceded there was no need for a curative jury instruction, and the court ensured with the deputy that the events would not reoccur.

The second incident happened shortly after the first witness began testifying. The witness, one of the first officers to respond to the apartment, was describing the kukri when the court called for a recess, noting that one of the jurors "may be in distress." Outside the jury's presence, the court described that one of the jurors appeared to have fainted, noting that same juror "expressed some concern about exposure to blood during voir dire." The juror was treated by medical personnel and did not want to go to the hospital but was "a little concerned about continuing." The court agreed the juror should be excused from further service, but Hunter's attorney expressed concern that the incident could have a prejudicial effect on the other jurors and requested a mistrial. He noted that it was early into the trial and that, coupled with the deputy accompanying Hunter into the courtroom in the presence of another juror, "the snowball starts to roll a little bit."

The court denied a mistrial, stating its belief that the remaining jurors would not be affected by seeing a peer faint. The court noted that "pretty graphic" photos

of the crime scene and autopsy would be offered into evidence during trial and expressed more concern about the prejudicial effect they could have on the jurors. But ultimately, the court found that witnessing a juror fainting during a brief description of the scene would not cause prejudice to either Hunter or the State.

On appeal, Hunter claims the court was too focused on the two-year anniversary of the crime approaching and bringing resolution than to ensuring his right to a fair trial. Though the court noted the need to bring resolution, it emphasized that resolution was not just for the State and the public, but it was necessary to ensure Hunter received a fair and speedy trial. "The public interest that a result be reached which promotes a well-ordered society is foremost in every criminal proceeding." *Young v. United States*, 315 U.S. 257, 259 (1942). The court did not abuse its discretion by considering this factor in denying mistrial.

"Although a defendant is entitled to a fair trial, he is not necessarily entitled to a perfect one." *State v. Gansz*, 376 N.W.2d 887, 891 (Iowa 1985). The court abuses its discretion in denying a mistrial "only when defendant shows prejudice which prevents him from having a fair trial." *State v. Callender*, 444 N.W.2d 768, 770 (Iowa Ct. App. 1989). The brief observation of Hunter in the custody of the deputy when entering the courtroom by a single juror was not enough for Hunter to request a mistrial. *State v. Wilson*, 406 N.W.2d 442, 448 (Iowa 1987) (distinguishing cases in which a defendant is restrained or in prison clothing while in the courtroom during trial from those involving jurors' brief and inadvertent observation of a defendant being moved to or from the courtroom during recess); *State v. Buchanan*, No. 03-0230, 2004 WL 1071896, at *5 (Iowa Ct. App. May 14, 2004) (noting that "the concern regarding prejudice is from having the defendant

in the presence of the jury for an extended period of time in prison attire, restraints, or both," but that "both our supreme court and the United States Supreme Court have distinguished between this type of continual and unavoidable reminder of the accused's condition, and a brief observation of the accused in prison attire or restraints"). Hunter also failed to show the remaining jurors were prejudiced by witnessing one juror faint early in the proceedings. Neither event was prejudicial separately, nor did they combine to reach the level of prejudice where mistrial was required. The court did not misapply the law or misconstrue the facts before it in denying a mistrial. Because it properly exercised its discretion, we affirm.

**B. Evidentiary Rulings.**

Hunter challenges several of the district court's evidentiary rulings. He contends the court abused its discretion by (1) excluding evidence of Swalwell's character, (2) admitting an excessive number of autopsy photos into evidence, and (3) limiting his cross-examination of witnesses after re-direct.

*1. Evidence of victim's character.*

Hunter complains that the trial court disallowed evidence that Swalwell served time in prison and used methadone. Hunter sought to introduce evidence that Swalwell served time in prison to explain statements Hunter made about not wanting to be Swalwell's "prison bitch." He wanted to introduce evidence of Swalwell's methadone use to show Swalwell was withdrawing from heroin or morphine, which can affect sleep and cause confusion, fear, anger, and hallucinations. Hunter contends the evidence provides context for why he reacted as he did when Swalwell assaulted him.

"Evidence of a homicide victim's prior violent or turbulent character is ordinarily immaterial and not admissible at trial." *State v. Webster*, 865 N.W.2d 223, 243 (Iowa 2015) (citation omitted). There is an exception when a defendant claims self-defense and introduces "the slightest supporting evidence." *Id.* (citation omitted). But this evidence can be introduced to show the defendant's state of mind—"the degree and nature of his or her apprehension of danger which might reasonably justify resort to more prompt and violent measures of self-preservation"—only if these character traits were known to the defendant. *State v. Jacoby*, 260 N.W.2d 828, 837 (Iowa 1977).

Before trial, the district court said that if Hunter "has any observations about [Swalwell] that really do relate to [his] propensity for violence, I would probably let that in." But the court was uncertain that evidence of Swalwell's prison time, without knowing the nature of his conviction, or an addiction to heroin met that standard. The court cautioned that Hunter needed to show "how those relate specifically to propensity for violence" before it would admit the evidence.

Hunter failed to show a correlation between the evidence of prison time and methadone use and a propensity for violence. When the question of Swalwell's prison time arose during trial, the court noted that the reason Swalwell had been imprisoned "was over some bad checks, including some stolen from his parents." It rejected the premise that "having been in prison in and of itself, regardless of the reason, makes an individual potentially more violent" or justified Hunter's reaction. And during an offer of proof outside the presence of the jury, the medical examiner testified about the possible effects of methadone use on a person but could only speculate on how methadone affected Swalwell. Because Hunter failed to show

how the evidence of Swalwell's character was more probative than prejudicial, the court properly exercised its discretion in excluding it.

*2. Autopsy photos.*

The medical examiner took 251 photos depicting Swalwell's injuries. The State offered forty of those photos into evidence at trial. Hunter objected to all but two of the photos, arguing that evidence of the nature of Swalwell's injuries could be admitted through the medical examiner's description and the graphic nature of the photos was unfairly prejudicial and the evidence was cumulative:

> Multiple photographs of the same wounds, close-up photographs of the same wounds, are certainly just unfairly prejudicial and are clearly for the inflaming the passion of the jury and utilizing—quite honestly, in a situation where there is no dispute as related to the actual death, there's no dispute as to the individual that caused the death, it just seems excessive and unfairly prejudicial, Your Honor.

After reviewing the photos, the court admitted twenty-five into evidence. It explained that in determining how many photos to admit, "it's a question of the State being able to show the individual injuries that led to [Swalwell]'s death." After weighing the relevance of the photos against the danger of unfair prejudice and the cumulative nature of the evidence, the court found that "the nature of the acts that resulted in [Swalwell]'s death . . . do justify the larger number of photographs . . . considering the nature and the number of individual injuries."

The question is whether the probative value of the photographs was outweighed by the danger of unfair prejudice. Hunter argues the trial court abused its discretion in admitting twenty-four of the twenty-five photos into evidence, claiming "[t]he only reason for the massive amounts of grisly and gruesome autopsy photographs was to impassion and inflame the jury." We disagree. "That

the autopsy photographs were themselves somewhat gruesome does not render them inadmissible. Murder is often a gruesome affair giving rise to equally gruesome evidence. That alone is not sufficient reason to exclude that evidence." *State v. Brown*, 397 N.W.2d 689, 700 (Iowa 1986) (internal citation omitted). Nor is the fact that the nature of Swalwell's injuries and his cause of death are uncontested. *See State v. Fryer*, 243 N.W.2d 1, 7 (Iowa 1976) ("That facts depicted by photographs are not contested does not necessarily render them inadmissible."). That the photos are cumulative is also not sufficient reason, standing alone, to require their exclusion. *See State v. Munz*, 355 N.W.2d 576, 580 (Iowa 1984).

The evidence at issue is like that in *Munz*: "The photographs were, to put it mildly, explicit. Considered outside the factual context of this case, they could even be characterized as shocking. But the crimes charged were shocking, and the photographs . . . merely embellished the verbal picture of the events already provided by the testimony . . . ." *Id.* The supreme court determined that under such circumstances, "we are reluctant to find prejudice sufficient to override the probative value" and affirmed the ruling admitting the evidence. *Id.* The photos depicting the extent and nature of Swalwell's injuries are relevant to whether Hunter was acting in self-defense. Although graphic, the danger of unfair prejudice does not outweigh their probative value. Having balanced the State's need to refute Hunter's justification defense against the sensational nature of the photos, the court exercised its discretion in determining which to admit into evidence.

*3. Limiting cross-examination after re-direct.*

Hunter contends the trial court violated his constitutional right to confrontation by limiting his ability to cross-examine witnesses following re-direct. He complains that doing so severely limited his trial tactics and strategy, and prejudiced his ability to mount a defense.

Restrictions on cross-examination can violate a defendant's right to confrontation. *See State v. Veal*, 564 N.W.2d 797, 807 (Iowa 1997), *overruled on other grounds by State v. Hallum*, 585 N.W.2d 249, 253 (Iowa 1998). For this reason, "cross-examination of the State's witnesses should be liberally extended." *State v. Cuevas*, 288 N.W.2d 525, 530 (Iowa 1980). But the right to cross-examination is not unlimited; the trial court can limit the scope of cross-examination "to (1) matters inquired into on direct examination or (2) matters which pertain to the witness's credibility, bias, ill will, hostility or interest in the case." *Id.*

Likewise, "[t]he right to, and scope of, recross-examination is within the discretion of the trial court." 98 C.J.S. *Witnesses* § 582; *accord State v. Deshaw*, 404 N.W.2d 156, 158 (Iowa 1987) ("The scope of redirect [and recross-]examination rests largely in the discretion of the trial court."). As with cross-examination, the trial court ordinarily limits recross-examination to matters explored on redirect examination. *See* 98 C.J.S. *Witnesses* § 582; *McCormick on Evidence* § 32 at 47 (5th ed. 1999) ("Like redirect, recross-examination follows the norm of first opportunity. Consequently, the scope of recross as of right is normally confined to questions directed to explaining or avoiding new matter brought out on redirect."). The court

> may properly refuse recross-examination as to matters which were not opened up, or brought out, on redirect examination; matters already fully covered; matters discussed at length on cross-examination; matters with respect to which there was an opportunity to cross-examine the witness; or where there is no claim of oversight; and no reason stated why the matter was not inquired into in the cross-examination.

98 C.J.S. *Witnesses* § 582 (footnotes omitted).

Hunter concedes that "the trial court did allow the defense to ask questions on re-cross-examination with permission." Because the court may limit the scope of cross- and recross-examination, we cannot find the court abused its discretion.[7]

**C. Cumulative Error.**

Finally, Hunter claims that even if each of the discretionary rulings he complains of on appeal did not rise to the level of prejudice individually, the cumulative effect of those rulings prejudiced his ability to have a fair trial.

When there is merit to multiple assigned errors, the court may find the cumulative effect of those errors deprived the defendant of a fair trial. *See State v. Carey*, 165 N.W.2d 27, 36 (Iowa 1969). In those limited cases, the defendant is entitled to a new trial. *See id.* But if a defendant fails to show any assigned error was prejudicial, no cumulative prejudice exists. *See State v. Pierce*, 287 N.W.2d 570, 575 (Iowa 1980). Because Hunter has not established prejudice in any of his assignments of error, his claim of cumulative error likewise fails.

---

[7] Hunter also fails to cite specific times when he wanted to recross-examine a witness but was disallowed. We will not speculate about the error Hunter complains of or what impact, if any, it had on the outcome of trial. *See Goode v. State*, 920 N.W.2d 520, 524 (Iowa 2018) ("Our appellate rules of procedure and judicial restraint expect claims raised on appeal be specific. A party who fails to satisfy this standard risks waiving the issue." (internal citations omitted)).

**IV. Conclusion.**

Because substantial evidence shows Hunter was not justified in killing Swalwell and the district court properly exercised its discretion in ruling on the motion for mistrial and the admissibility of evidence, we affirm Hunter's conviction of first-degree murder.

**AFFIRMED.**